UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
———

ALPHONSO SONES,

                    Petitioner,                Case No. 1:07-cv-552

v.                                          Honorable Janet T. Neff

THOMAS K. BELL,

                    Respondent.
_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving a term of 22 to 36 years, imposed by the Muskegon County Circuit Court on April 17, 2003, after a jury convicted Petitioner, as a third felony offender, of armed robbery, MICH. COMP. LAWS § 750.529.[1] In his *pro se* petition, Petitioner raises eight grounds for relief, as follows:

I.        DEFENDANT WAS DENIED A FAIR TRIAL BY INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL.

II.       DEFENDANT IS ENTITLED TO RESENTENCING WHERE HIS SENTENCE IS DISPROPORTIONATE TO THE SEVERITY OF THE CRIME.

III.      THE TRIAL COURT IMPROPERLY SCORED THE SENTENCING GUIDELINES.

---

[1]Petitioner is serving a second term of 22 to 36 years on a second armed robbery that occurred three days after the offense in issue, for which Petitioner was sentenced on October 10, 2003.

IV.     DEFENDANT IS ENTITLED TO RELIEF BECAUSE HE WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.

V.      IF THE COURT FINDS THAT "CAUSE" PER MCR 6.508(D)(3)(a) HAS NOT BEEN ESTABLISHED, IT THEN MUST EXERCISE ITS DISCRETION UNDER MCL 770.1 AND DETERMINE IF RELIEF FROM JUDGMENT IS REQUIRED.

VI.     DEFENDANT'S CONVICTION ARE [SIC] CONTRARY TO THE GREAT WEIGHT OF THE EVIDENCE.

VII.    WHERE CARTER'S CONFRONTATION WITH DEFENDANT AT THE PRELIMINARY EXAMINATION WAS HIGHLY SUGGESTIVE, AND WHERE CARTER'S IN-COURT IDENTIFICATION AT TRIAL HAD NO INDEPENDENT BASIS, IT WAS PLAIN ERROR TO INTRODUCE THESE IDENTIFICATION[S] AT TRIAL:  ALTERNATIVELY, DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILURE TO MOVE TO SUPPRESS THE INDENTIFICATIONS [SIC], OR TO HAVE MOVED FOR A LINE-UP, AND THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING DEFENDANT'S MOTION REQUESTING THE COURT TO TAKE JUDICIAL NOTICE OF THE UNREALIABILITY [SIC] OF EYEWITNESS IDENTIFICATION.

VIII.   THE PROSECUTOR DENIED DEFENDANT A FAIR TRIAL BY FAILING TO DISCLOSE THE EXISTENCE OF A PRETRIAL IDENTIFICATION PROCEDURE AND THE PHOTOGRAPH USED TO IDENTIFY MR. SONES, US CONST AM XIV.

(Mem. in Supp. of Pet. at i, docket #1 at 17.)

Respondent has filed an answer to the petition (docket #6) stating that the grounds should be denied because they are noncognizable state law claims, are procedurally defaulted and have no merit.  Upon review and applying the AEDPA standards, I find that all grounds are either noncognizable or without merit.  Accordingly, I recommend that the petition be denied.

## Procedural History

### A.    Trial Court Proceedings

The state prosecution arose from the armed robbery of a Shell gas station on August 26, 2002.  Following a preliminary examination held September 16, 2002, Petitioner was bound over on one count of armed robbery.  A supplemental information was filed charging Petitioner as a habitual offender, third offense.  Petitioner was tried before a jury on February 12, 2003 and concluding on February 13, 2003.

On February 10, 2003, shortly before the trial commenced, the court held a hearing on Petitioner's motion to take judicial notice of the inherent unreliability of eyewitness identification.  (2/10/03 Hrg. Tr. at 3, docket #11.)  At the hearing, defense counsel argued that, in light of the accepted research and the results of trials involving exonerating DNA evidence, the court should make judicial findings and instruct the jury that such evidence is historically and scientifically suspect.  (*Id.* at 4.)  In support of his argument, defense counsel cited two Michigan cases, *People v. Anderson*, 205 N.W.2d 461 (Mich. 1973), *overruled by People v. Hickman*, 684 N.W.2d 267, 271 (Mich. 2004), and *People v. Carson (Carson II)*, 560 N.W.2d 657, 664 (Mich. Ct. App. 1996) (special conflict panel), *reinstating in relevant part People v. Carson (Carson I)*, 553 N.W.2d 1, 5 (Mich. Ct. App. 1996).  Counsel argued that, in *Anderson*, the Michigan Supreme Court, in the course of finding that the appointment of counsel and other protections was required before an identification lineup was used, referred to studies which concluded that eyewitness testimony was unreliable.  Counsel argued that the court could take judicial notice of those studies. The court held that *Anderson* had not established evidence of which the court could take judicial

notice. (2/10/03 Hrg. Tr. at 17-18.) The court, however, reserved the question whether an appropriate defense instruction would be allowed. (*Id.* at 19.)

Before the jury pool was called, the trial court considered Defendant's proffered instructions on the reliability of eyewitness evidence. The first instruction stated, "You should recognize that eyewitness identifications are among the least accurate of all classes of evidence." (Tr. I, 5.) The second instruction provided, "Significant numbers of innocent people have been convicted of crimes they did not commit due to eyewitness misidentification." (Tr. I, 5.) The trial court rejected the instructions, relying on *People v. Cooper*, 601 N.W.2d 409, 417 (Mich. Ct. App. 1999), which held that "'*Anderson* does not require any special jury instruction regarding the manner in which a jury should treat eyewitness identification testimony.'" (Tr. I, 6-7 (quoting *Cooper*, 601 N.W.2d at 417).)

During voir dire, defense counsel asked questions, conveying information about people being wrongly convicted. The prosecutor objected on the grounds that the questioning was designed to present to the jury facts that the court previously had ruled were inappropriate. (Tr. I, 74-75.) Defense counsel acknowledged that he did not intend to introduce expert evidence about the strengths or limitations of direct evidence. (Tr. I, 76.) He argued, however, that he wanted only to test the jurors understanding that reasonable doubt can grow out of the quality of the evidence. (Tr. I, 76.) The court sustained the objection, holding that defense counsel was introducing facts that would not be in evidence and that the questioning was beyond the purposes of voir dire. Defense counsel then moved for an adjournment of trial to allow him to obtain an expert on identification evidence. (Tr. I, 80.) The prosecutor objected, noting that the trial had already been adjourned for a month in order to permit defense counsel to investigate and hire an expert on the identification

issue, but counsel had failed to do so. (Tr. I, 80.) The prosecutor also argued that such evidence was inadmissible. (Tr. I, at 81.) Defense counsel responded that he had investigated two experts from the other side of the state, but he had held off engaging them because of the associated expense, hoping that he would prevail on his argument under *Anderson* or be allowed to question on voir dire. Having been denied both, defense counsel argued that an expert was required to protect Petitioner's rights at trial, as most of the evidence against him was identification evidence. (Tr. I, 88.) The court concluded that defense counsel had made a strategic decision not to further pursue an expert during the time of adjournment and, only after failing in that strategy, brought a motion to adjourn. The court denied the motion as untimely. (Tr. I, 94.)

After the jury was sworn, Petitioner moved in limine for the prosecution to declare its intent to introduce under MICH. R. EVID. 404(b) identification evidence from another armed robbery with which Petitioner was charged. Counsel argued that the prosecution had moved for the introduction of such evidence, representing an intent to use it, but had since reserved its decision. According to defense counsel, the prosecutor's failure to decide before the trial began gravely affected the kind of cross-examination he would conduct. Specifically, it affected whether he would explore the specifics of the lineup, at which more than just the two eyewitnesses to the case identified Petitioner. (Tr. I, 109-110.) The court denied the motion. (Tr. I, 115.)

Quianna Carter testified that, on August 26, 2002, she was working with a co-worker, Leeandrew DeVette, at the Shell station located at 275 West Muskegon in Muskegon, Michigan. (Tr. I, 122.) At about 3:29 a.m., a black man came into the store and asked for a carton of Basic Menthol cigarettes. (Tr. I, 123-24.) While she looked for a carton, her co-worker Leeandrew came out of the back room. They found that they did not have a carton, so they took down the cigarette

rack in order to get him ten individual packs to make a carton. (Tr. I, 124.) At that point, the man, whom Carter identified as Petitioner, came behind the counter holding a knife and ordered them to put the money in the bag. (Tr. I, 126.) The knife had a black handle and was long. Petitioner was waiving the knife and pointing at the bag. He wanted Leeandrew to get a bag, but every time Leeandrew moved to reach for the bag, Petitioner became nervous. They gave him the whole drawer from the cash register. (Tr. I, 128.) The drawer contained some amount over $200.00. (Tr. I, 129.) Petitioner told both workers to stand there and not turn around. He walked out of the store backwards, holding the knife. (Tr. I, 129.) When he got outside, he went left towards Third Street. (Tr. I, 129.) Shortly before the man arrived, Leeandrew had cleaned the counter. (Tr. I, 129-130.) Carter testified that she was scared. (Tr. I, 130.) Four days later, she attended a line-up of five people. She identified Number 4 in the lineup as the man who had robbed the store. (Tr. I, 130-31.) She also identified the person in the lineup as Petitioner. (Tr. I, 131.) She identified People's Exhibit 1 as a pack of Basic Menthol 100's, which was the type of cigarette stolen in the robbery. (Tr. I, 132.) Carter also identified a video of the shell station taken by surveillance cameras in the store, and the video was played for the jury. (Tr. I, 123, 132-37.) Carter testified that the man who appeared in the video frame was coming from outside. She identified Leeandrew coming out of the back storeroom. She described the video showing the man grabbing the cigarettes from the rack that had dropped down. The man in the video then told them to get back, motioning with the knife. The man told them to give him the money, and the video shows Leeandrew motioning as he tried to get a bag, but the man got nervous and made him stop. Then they gave the man the whole drawer. (Tr. I, 132-35.) Carter identified the knife, the cash drawer and Leeandrew making a phone call. The video later shows the police car arriving. (136-37.) Carter testified on cross-examination that

Petitioner was wearing a white T-shirt with lettering, blue sweatpants and black Nikes. (Tr. I, 138-39.) Carter described the robber to police as a black male, between 43 and 45, with a medium build and facial hair. (Tr. I, 141.) Defense counsel thoroughly questioned Carter about photographs of the other men in the lineup, noting differences in age, hair length, color and build. (Tr. I, 149-58.) Carter denied looking at mug shots before she viewed the lineup. (Tr. I, 146.)

Leeandrew DeVette testified that, on August 26, 2002, he worked at Lemon Shell at 275 West Muskegon alongside Quianna Oaks.[2] (Tr. I, 167.) Shortly before the robbery, he was washing out the coffee pots. He and Quianna had been cleaning the store. He was in the back room when he heard the bell ring, indicating that someone had come into the store. (Tr. I, 168.) DeVette did not immediately come out of the back room because Quianna was out front by the register. He came out of the back room just after Petitioner had asked for a carton of cigarettes. (Tr. I, 168.) Petitioner requested a carton of Basic Menthol 100's. (Tr. I, 169.) Quianna had just started working at the store, and DeVette told her that they did not carry cigarettes in the cartons. He came out to show her what to do. (Tr. I, 168-69.) When a customer asked for a carton, the sales clerk was required to count out ten packs from the cigarette rack that hung over the counter. (Tr. I, 170.) When they lowered the cigarette rack to start counting the cigarettes, Petitioner ran around the corner of the counter and came next to DeVette with a black-handled, kitchen-type knife. (Tr. I, 170-72.) Petitioner told DeVette to back up. (Tr. I, 170.) Petitioner said, "Give me a bag" and "Give me the money." (Tr. I, 172.) He also indicated things he wanted by pointing the knife at them. (Tr. I, 172.) DeVette backed up and tried to grab a paper bag for Petitioner. As he reached for it, Petitioner swung the knife toward his hand again, so he pulled back. He tried a couple of

---

[2]DeVette testified that he was not entirely sure of Quianna's last name, but he thought it was Oaks. He identified Quianna as the person he saw leave the courtroom just before he entered. (Tr. I, 167.)

times and then both he and Quianna took out the cash drawer and gave it to Petitioner. (Tr. I, 173.) DeVette testified that Petitioner was only a couple of feet from him and that he got a good look at him. DeVette identified Petitioner in the courtroom. (Tr. 173-74.) They remained where they were until Petitioner left the store. Then, Quianna ran around the counter to see where he went, while DeVette called the police. DeVette made a courtroom identification of Petitioner as the robber. (Tr. I, 174.) Four days after the robbery, DeVette came to the police station to view a lineup of five or six people. DeVette identified Petitioner as number four in the lineup. According to DeVette, the cash drawer had about $390.00. (Tr. I, 175.) On cross-examination, DeVette acknowledged that, when the detective showed him a knife, he could not identify it as the knife that was used, as he did not remember how big the knife was. (Tr. I, 177.) He only knew that it was black-handled and was a kitchen-type knife. (Tr. I, 177-78.) He described the robber as somewhat shorter than himself, possibly 5'5" to 5'7". He had a smaller build, with unkempt hair that was not very short. He also had facial hair that was not groomed. (Tr. I, 179.) The man was wearing black Nikes and blue sweatpants. (Tr. I, 180.) DeVette stated that he was a little afraid at the time of the robbery, but that he had remained focused on the robber. (Tr. 1, 176, 181.)

Muskegon Police Officer Michael Lamsma testified that he was dispatched to the scene on August 26, 2002. He had received training in latent fingerprints. (Tr. II, 188.) He served the Muskegon Police Department as a crime scene technician. (Tr. I, 189.) Lamsma took digital photos of the scene. He identified a series of the prosecution's exhibits as photographs he took. (Tr. I, 190-91.) Lamsma testified that usable fingerprints depend on the surface, together with a variety of other factors. Even clear prints only occasionally come back from the laboratory having been identified as belonging to a particular person. (Tr. I, 191-92.) Lamsma focused his attention on the

counter next to the cash till and the interior part of the glass door leading into the gas station.  (Tr. I, 193.)  He was told that the surfaces he examined had recently been cleaned.  (Tr. I, 193.)  Lamsma located only two prints that had sufficient ridge detail to be potentially useful for identification.  (Tr. I, 193.)  He lifted the prints and they were placed into evidence for transmission to the crime lab.  (Tr. I, 194.)  The laboratory later reported that the prints had insufficient ridge detail for identification purposes.  (Tr. I, 195.)

Muskegon Police Sergeant Tim Lewkowski testified that he was aware of the August 26, 2002 armed robbery.  On August 30, 2002, he came across an individual whom he believed matched the description and photos taken from the video.  (Tr. I, 199.)  The man was wearing dark blue sweatpants and a white T-shirt.  (Tr. I, 202.)  Lewkowski talked to the individual and, in a search found a package of Basic Menthol 100s in his right rear pocket.  He identified that person as Petitioner.  (T. I, 200.)  He notified the officer in charge of the robbery investigation, Detective Ziegler, about his contact.  (Tr. I, 201.)

The parties stipulated to the contents of the fingerprint report.  The report showed that the ridge characteristics were insufficient to be of value to identify or exclude any individual.  (Tr. II, 215-16.)

Muskegon Police Sergeant Gary Cheatum testified that he was trained as a canine handler.  (Tr. II, 217.)  He was called to the scene with his dog, Irk, and they tracked the robber from the side of the Shell station, across the street and along the side of the Midtown building, and then turned the corner and continued tracking on the Houston Street side of the Midtown building.  They lost the scent mid-way through the parking lot.  (Tr. II, 218.)  They found no evidence in the parking lot.  (Tr. II, 218.)  On cross-examination, Cheatum acknowledged that, after viewing a photo taken

from the video, he told Officer Kitchen that the person looked like Jimmie Foreman, and Kitchen agreed. (Tr. II, 219.)

Petitioner was then asked to show the jury the back of his head, tilting his head back. (Tr. II, 220-21.)

Muskegon Police Detective Gerald Ziegler testified that he was in charge of the investigation. The police officers never recovered the cash drawer. (Tr. II, 222.) Ziegler put out a BOL (Be On the Lookout) for the robber with a description that included the general descriptions provided by the other witnesses, together with a notation that the suspect had a pronounced, visible bald spot on the crown of his head. (Tr. II, 222-23.) Officer Lewkowski told Ziegler that he had a suspect, and Ziegler identified Petitioner as the suspect mentioned by Lewkowski. (Tr. II, 223.) When he questioned Petitioner, Ziegler advised him of his rights. Petitioner denied being present when the robbery occurred. When asked where he was at the time, Petitioner told Ziegler that he did not know and was probably drunk somewhere. (Tr. II, 224.) Petitioner told Ziegler that he had been unemployed for three months, but he denied having money trouble. (Tr. II, 225-26.) He had approximately $23.00 in his possession at the time of the interview. (Tr. (II, 225.) Petitioner told Ziegler that he got the money picking up bottles on the street. (Tr. II, 226.) He also claimed that he got money from his daughter and his girlfriend. (Tr. II, 226.) He also told Ziegler that he had gotten the money from cutting grass. When Ziegler tried to confirm the address where he had cut grass, Petitioner could not provide it. (Tr. II, 226.) When Petitioner was picked up, he was wearing blue sweatpants and a white T-shirt. (Tr. II, 227.) Ziegler subsequently located Petitioner's automobile. (Tr. II, 227.) When he searched the vehicle, he found a black knife with a silver blade. (Tr. II, 228.) Both Quianna Carter and Leeandrew DeVette indicated that it was not the knife used

in the robbery.  (Tr. II, 228.)  They did not find either black Nikes or a cash drawer.  (Tr. II, 228.)

Petitioner told Ziegler that he was staying in multiple places, most recently, his daughter's house.

(Tr. II, 228.)  Ziegler managed to reach the daughter by telephone, but she did not come to the

department for an interview.  (Tr. II, 229.)  At the time of his interview with Ziegler, Petitioner had

been drinking.  (Tr. II, 232.)  Although the room was not hot, Petitioner began sweating.  (Tr. II,

233.)

      Ziegler attended the lineup.  Also present were two assistant prosecutors and defense

attorney Annette Smedley.  (Tr. II, 229.)  Before witnesses were allowed to view the array, both the

prosecutors and defense counsel were allowed to see the array.  The defense attorney had no

objection to the array.  (Tr. II, 230.)  Carter viewed the lineup first.  (Tr. II, 230.)  She was told not

to speak with anyone else about who she identified.  (Tr. II, 230-31.)  Carter came into the room,

scanned the lineup, and identified number four.  (Tr. II, 231.)  He took Carter out of the room and

back to the room where DeVette was waiting.  (Tr. II, 231.)  Ziegler then took DeVette to the lineup

room.  Ziegler testified that Carter and DeVette did not speak during that time.  (Tr. II, 231.)

DeVette scanned the lineup and identified number four, Petitioner, as the robber.  DeVette's

identification was even quicker than Carter's.  (Tr. II, 231-32.)  Ziegler testified that one of his jobs

was to keep records of who was in the array.  All of the men in the array were between 46 and 49

years of age.  Petitioner was 49.  (Tr. II, 232.)

      Ziegler testified that he followed up on the name of Jimmie Foreman by seeing if

he could locate a photograph of Foreman.  He did not find one.  (Tr. II, 233.)  He also could not

locate Foreman to interview him.  (Tr. II, 234.)  On cross-examination, Ziegler acknowledged that

he did not make an effort to find a photograph and did nothing else to investigate.  (Tr. II, 234.)

Ziegler provided the names of the five lineup participants. (Tr. II, 235.) Ziegler also acknowledged that, while Petitioner could not provide an address of the lawn he mowed, he told Ziegler the house was on Howland in the 500 block. Ziegler did not check it out. (Tr. II, 236.) Ziegler did attempt to have the video image enhanced by taking it to one of the media technicians at Muskegon Community College. (Tr. II, 237.) He acknowledged that none of the identified clothing was located in Petitioner's car. (Tr. II, 238.) Ziegler did not obtain search warrants for the homes of people with whom Petitioner had stayed over the prior weeks because he did not believe it was right to go into three or four or five houses and search people's personal belongings solely because Petitioner had stayed there for any period. (Tr. II, 241.) Ziegler spoke to Ms. Mayhand, one of the individuals Petitioner identified as having housed him. Mayhand allowed Ziegler into the house and into her vehicle to look around. (Tr. II, 242.) Ziegler did not look at Petitioner's daughter's house because she did not come in for an interview as he had requested. (Tr. II, 243.)

The parties stipulated to the introduction of two photographs of Jimmie Foreman that the Sheriff's Department pulled from their computer system. (Tr. II, 244.) They also agreed to stipulate that the two photographs are the only photographs of a Jimmie Foreman in the Muskegon County Sheriff's Department computer system. (Tr. II, 246-47.) Finally, the parties stipulated to the introduction of one other photograph of Petitioner. (Tr. II, 247.)

After the prosecution rested, the defense admitted only a single stipulation that the duration of the robbery was one minute, twenty-six seconds. (Tr. II, 247.)

Before closing arguments, defense counsel raised two matters he intended to discuss during his closing, to which he anticipated an objection. First, he intended to discuss the reliability of eyewitness testimony and to indicate that the Michigan Supreme Court had some things to say

about that reliability, reading from a supreme court opinion. (Tr. II, 252.) Second, he intended to mention that innocent people had been released from prison after DNA evidence showed that they could not possibly have committed the crimes of which they were convicted using mistaken eyewitness testimony. (Tr. II, 253.) The court concluded that Petitioner could not do either thing he proposed, both because the remarks would not be based on evidence introduced at trial and because the language of the supreme court had the potential to confuse the jury because it did not completely correspond with the jury instruction. (Tr. II, 257-58.)

At the conclusion of trial, on February 13, 2003, the jury found Petitioner guilty of armed robbery. (Tr. II, 303.) On April 17, 2003, Petitioner was sentenced as a third habitual offender to a prison term of 22 to 36 years. (Sentencing Transcript, (S. Tr.), 18, docket #14.)

## B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on November 12, 2003, raising two issues:

    I.      DID THE TRIAL COURT ABUSE ITS DISCRETION BY DENYING DEFENDANT'S MOTION REQUESTING THE COURT TO TAKE JUDICIAL NOTICE OF THE UNRELIABILITY OF EYEWITNESS IDENTIFICATION?

    II.     WAS DEFENDANT DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL BY HIS ATTORNEY'S FAILURE TO OBJECT TO, AND REQUEST A CURATIVE INSTRUCTION ON, PLAINTIFF'S CLOSING ARGUMENT THAT WITNESS CARTER WAS LIKELY TO MAKE A CORRECT IDENTIFICATION BECAUSE THE ROBBERY WAS AN "EXTREMELY TRAUMATIC" EVENT?

(Def.-Appellant's Br. on Appeal, docket #18.)   By unpublished opinion issued July 15, 2004, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's conviction and sentence. (*See* 7/15/04 Mich. Ct. App. Opinion (MCOA Op.), docket #18.)

Petitioner sought leave to appeal to the Michigan Supreme Court. Petitioner raised the same two claims raised before and rejected by the Michigan Court of Appeals. By order entered December 29, 2004, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Ord., docket #21.)

## C.    Post-conviction relief

On November 7, 2005, Petitioner filed a motion for relief from judgment in the Muskegon County Circuit Court, raising the same eight issues he raises in his petition for habeas relief. The circuit court issued an opinion and order denying the motion on February 24, 2006. (*See* 2/24/06 Cir. Ct. Ord., docket #20.) Petitioner sought reconsideration, which was denied by the circuit court on March 20, 2006. (*See* 3/20/06 Cir. Ct. Ord., docket #20.)

Petitioner filed an application for leave to appeal in the Michigan Court of Appeals, raising the same issues. On December 27, 2006, the court of appeals denied leave to appeal for failure to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D). (*See* 12/17/06 MCOA Ord., docket #20.) The Michigan Supreme Court denied leave to appeal for the same reason on May 30, 2007. (5/30/07 Mich. Ord., docket #19.)

## <u>Standard of Review</u>

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant

to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### I.    Procedural Default

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground

properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster,* 324 F.3d at 436-37; *Greer v. Mitchell,* 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell,* 274 F.3d 337, 348 (6th Cir. 2001).

Here, the Muskegon Circuit Court, the Michigan Court of Appeals and the Michigan Supreme Court all expressly stated that they denied relief on Petitioner's motion for relief from judgment on the basis that Petitioner failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D). Because MICH. CT. R. 6.508(D) was enacted in 1989 and Petitioner's conviction and appeals took place well after, MICH. CT. R. 6.508(D) was a "firmly established" procedural rule for purposes of Petitioner's action. *See Luberda v. Trippett,* 211 F.3d 1004, 1006-07 (6th Cir. 2000); *Rogers v. Howes,* 144 F.3d 990, 994 (6th Cir. 1998).

With the exception of a portion of his seventh habeas ground, all of Petitioner's claims appear to be procedurally defaulted. Petitioner contends, however, that the ineffective assistance of appellate counsel constitutes cause excusing his default.

The Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones,* 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary,* 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson,* 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Where, as here, the

procedural default issue raises more questions than the claims on the merits, I will assume without deciding that Petitioner could show cause and prejudice for his default. *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

II.     Ground I:  Ineffective Assistance of Trial Counsel

In his first ground for habeas relief, Petitioner argues that he was denied a fair trial by counsel's ineffective assistance.  In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

## A.    Failure to investigate

Petitioner first argues that counsel was ineffective in failing to properly investigate his defense.  Specifically, he argues that counsel failed to call a witness who would have testified that Petitioner was at her home the entire day.

It is well established that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'" *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (quoting *Strickland,* 466 U.S. at 690). This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).  "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.  "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); accord *Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004).  A purportedly strategic decision is not objectively reasonable "when the attorney has failed to investigate his options and make a reasonable choice between them." *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir.1991) (cited in *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000)).

Courts have not hesitated to find ineffective assistance in violation of the Sixth Amendment when counsel fails to conduct a reasonable investigation into one or more aspects of the case and when that failure prejudices his or her client. For example, in *Wiggins v. Smith*, 539 U.S. 510, 524-29 (2003), the Supreme Court held that the petitioner was entitled to a writ of habeas

corpus because his counsel had failed to conduct a reasonable investigation into potentially mitigating evidence with respect to sentencing. *Id.* According to the Court, "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentence strategy impossible." *Id.* at 527-28. Consistent with *Wiggins*, the Sixth Circuit has held, in a variety of situations, that counsel's failure to investigate constituted ineffective assistance in violation of the Sixth Amendment. *See, e.g., Towns*, 395 F.3d at 258-59 (holding that defense counsel's failure to investigate potentially important witness in robbery and felony murder trial was unreasonable, and thus constituted ineffective assistance, in violation of Sixth Amendment); *Combs*, 205 F.3d at 287-88 (holding that defense counsel was constitutionally ineffective for failing to investigate adequately his own expert witness, who testified that, despite the defendant's intoxication at the time of the crime, the defendant nevertheless was capable of forming the requisite intent to commit the crimes); *Sims v. Livesay*, 970 F.2d 1575, 1580-81 (6th Cir. 1992) (holding that counsel was constitutionally ineffective for failing to conduct an investigation into certain physical evidence that would have undermined the prosecution's theory that the victim was shot at a distance); *Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir. 1987) (holding that counsel's failure "to investigate a known and potentially important alibi witness" constituted ineffective assistance because "[c]ounsel did not make any attempt to investigate this known lead, nor did he even make a reasoned professional judgment that for some reason investigation was not necessary"); *see also Clinkscale*, 375 F.3d at 443 (collecting cases in which counsel's failure to investigate a potentially important witness constituted ineffective assistance).

In *Bigelow v. Williams*, 367 F.3d 562 (6th Cir. 2004), the Sixth Circuit addressed a claim that an attorney had failed adequately to investigate an alibi defense. *Id.* at 570-71. The court

considered a situation in which the attorney was aware of some evidence in support of the defense but allegedly failed to conduct further investigation to find additional witnesses. The court concluded that an attorney's "failure to call a known alibi witness generally would constitute ineffective assistance of counsel." *Id.* at 570; *see also Blackburn*, 828 F.2d at 1183 (failure to investigate a known and important alibi witness constituted ineffective assistance of counsel). The question at issue in *Bigelow* was whether the facts supported such a claim. The court decided that petitioner had failed to overcome the presumption of correctness that attached to the state court's finding that the attorney was unaware of the existence of certain alibi witnesses. The court remanded the case for determination with respect to the petitioner's claim regarding other witnesses, which the state court had failed to address. *Id.* at 571.

Here, Petitioner has failed develop his claim either in this court or in the state courts. He does not identify who the witness is or what the witness would say. Nor does he allege that defense counsel was made aware of the witness and the alibi defense before trial. Counsel could not be expected to investigate a defense or a witness unknown to him. *See Bigelow*, 367 F.3d at 571. Petitioner's allegations therefore do not undermine the strong presumption that counsel's performance was reasonable. *Strickland*, 466 U.S. at 689.

In addition, Petitioner is not entitled to an evidentiary hearing to develop his claim. Petitioner did not seek an evidentiary hearing in the state-court proceedings. Petitioner therefore has failed to demonstrate the necessary diligence required to obtain an evidentiary hearing in this Court. *See* 28 U.S.C. § 2254(e)(2). Moreover, Petitioner's representations fall far short of the sort of evidence sufficient to support his claim. *See* 28 U.S.C. § 2254(e)(2)(B) (barring an evidentiary hearing unless "the facts underlying the claim would be sufficient to establish by clear and

convincing evidence that, but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense).  He therefore is not entitled to an evidentiary hearing.

### B.  Failure to challenge admission of statement

Petitioner next argues that his attorney was ineffective in failing to move to suppress Petitioner's statement to police officers and in failing to object to the authenticity of the statement at trial.  Petitioner's arguments are without merit.

Petitioner argues that he was not read his *Miranda*[3] warnings before he was questioned by police officers.  In his motion for relief from judgment, however, Petitioner neither presented any evidence on the issue nor requested a *Walker*[4] hearing.  (*See* App. from Def. Mot. for Relief from J., docket #20 (seeking evidentiary hearing only on the effectiveness of appellate counsel).)  In contrast, Detective Ziegler unequivocally testified at trial that he advised Petitioner of his rights and that Petitioner indicated that he understood those rights.  (Tr. II, 224.)

As a consequence, Petitioner has failed to demonstrate factual support for his claim that he was not read his rights.  Moreover, Petitioner has failed to demonstrate necessary diligence required under 28 U.S.C. § 2254(e)(2) for an evidentiary hearing, and his representations fall far short of the sort of evidence sufficient to support his claim, *see* 28 U.S.C. § 2254(e)(2)(B).  Petitioner therefore fails to overcome the strong presumption that counsel acted reasonably in deciding not to file a motion to suppress.

To the extent that Petitioner argues that counsel should have objected at trial to Detective Ziegler's testimony about his statements on evidentiary grounds, Petitioner's own

---

[3]*Miranda v. Arizona*, 384 U.S. 436 (1966).

[4]*People v. Walker (On Rehearing)*, 132 N.W.2d 87 (Mich. 1965) (authorizing the trial court to hold a hearing to determine the voluntariness of a statement).

statement clearly was admissible at trial. *See* MICH. R. EVID. 801(d)(2) (a party's admission is not hearsay and is admissible at trial). Because admission of the statement was proper, counsel committed no error in failing to object. *See Chegwidden v. Kapture*, 92 Fed. Appx. 309, 311 (6th Cir. 2004)(counsel's failure to make a frivolous or meritless motion or objection does not constitute ineffective assistance of counsel); *A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir.1990); *United States v. Wright*, 573 F.2d 681, 684 (1st Cir. 1978).

I therefore recommend that Petitioner's claims of ineffective assistance of counsel be denied.[5]

### III.    Ground 2: Disproportionate Sentence per *People v. Milbourn*

In his second ground for habeas relief, Petitioner contends that he is entitled to resentencing because his sentence was disproportionate to the severity of the crime under the analysis enunciated by the Michigan Supreme Court in *People v. Milbourn*, 461 N.W.2d. 1 (Mich. 1990). Under *Milbourn*, the sentencing court must exercise its discretion within the bounds of Michigan's legislatively prescribed sentence range and pursuant to the intent of Michigan's legislative scheme of dispensing punishment according to the nature of the offense and the background of the offender. *Milbourn*, 461 N.W.2d at 9-10; *People v. Babcock*, 666 N.W.2d 231, 236 (Mich. 2003). It is plain that *Milbourn* was decided under state, not federal, principles. *See Lunsford v. Hofbauer*, No. 94-2128, 1995 WL 236677, at *2 (6th Cir. Apr. 21, 1995); *Atkins v. Overton*, 843 F. Supp. 258, 260 (E.D. Mich. 1994). A federal court may grant habeas relief solely

---

[5]Petitioner's independent claim of ineffective assistance of trial counsel is limited to the two issues discussed in this section. However, within the other grounds for relief, Petitioner has argued that counsel was ineffective in failing to raise a particular claim. I will address each of Petitioner's other arguments about the effectiveness of counsel within the context of the claims in which they are raised.

on the basis of federal law and has no power to intervene on the basis of a perceived error of state law. 28 U.S.C. § 2254(a); *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Pulley v. Harris*, 465 U.S. 37, 41 (1984). Thus, Petitioner's claim based on *Milbourn* is not cognizable in a habeas corpus action. Moreover, as more fully discussed in the following section, claims of disproportionality in state sentencing rarely provide grounds for federal habeas relief.

IV.     Ground 3:  Sentencing Guidelines Error

In his third ground for habeas relief, Petitioner argues that the trial court erred in applying the sentencing guidelines. Petitioner argues that he improperly was assessed 20 points under Prior Record Variable (PRV) 5 for criminal conduct that included prior misdemeanors. *See* MICH. COMP. LAWS § 777.55(1) (sentencing guideline for scoring prior misdemeanor and misdemeanor juvenile history). He also argues that he was improperly scored 25 points for Offense Variable (OV) 13 for three crimes against a person within a five-year period. *See* MICH. COMP. LAWS § 777.43(1) (sentencing guideline for scoring a continuing pattern of criminal behavior).

Claims concerning the improper scoring of sentencing guidelines are state-law claims and typically are not cognizable in habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S. 370, 373-74 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301-02 (6th Cir. 2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas relief); *Cheatham v. Hosey*, No. 93-1319, 1993 WL 478854, at *2 (6th Cir. Nov. 19, 1993) (departure from sentencing guidelines is an issue of state law, and, thus, not cognizable in federal habeas review); *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (the sentencing guidelines establish only rules of state law). There is no constitutional right to individualized

sentencing.  *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995).  Moreover, a criminal

defendant has "no federal constitutional right to be sentenced within Michigan's guideline minimum

sentence recommendations."  *Doyle v. Scutt*, 347 F. Supp. 2d 474, 485 (E.D. Mich. 2004); *accord*

*Lovely v. Jackson*, 337 F. Supp. 2d 969, 977 (E.D. Mich. 2004); *Thomas v. Foltz*, 654 F. Supp. 105,

106-07 (E.D. Mich. 1987).

       Although state law errors generally are not reviewable in a federal habeas proceeding,

an alleged violation of state law "could, potentially, 'be sufficiently egregious to amount to a denial

of equal protection or of due process of law guaranteed by the Fourteenth Amendment.'"  *Koras v.*

*Robinson,* 123 F. App'x 207, 213 (6th Cir. Feb. 15, 2005) (citing *Bowling v. Parker*, 344 F.3d 487,

521 (6th Cir. 2003)).  *See also Doyle*, 347 F. Supp. 2d at 485 (a habeas court "will not set aside, on

allegations of unfairness or an abuse of discretion, terms of a sentence that is within state statutory

limits unless the sentence is so disproportionate to the crime as to be completely arbitrary and

shocking.") (citation omitted).  A sentence may violate due process if it is based upon material

"misinformation of constitutional magnitude."  *Koras,* 123 F. App'x at 213 (quoting *Roberts v.*

*United States,* 445 U.S. 552, 556 (1980)); *see also United States v. Tucker,* 404 U.S. 443, 447

(1972); *Townsend v. Burke,* 334 U.S. 736, 741 (1948).  To prevail on such a claim, the petitioner

must show (1) that the information before the sentencing court was materially false, and (2) that the

court relied on the false information in imposing the sentence.  *Tucker*, 404 U.S. at 447;*United*

*States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984).  *Koras,* 123 F. App'x at 213 (quoting *United*

*States v. Stevens,* 851 F.2d 140, 143 (6th Cir. 1988)).  A sentencing court demonstrates actual

reliance on misinformation when the court gives "explicit attention" to it, "found[s]" its sentence

"at least in part" on it, or gives "specific consideration" to the information before imposing sentence. *Tucker*, 404 U.S. at 444, 447.

Petitioner's sentence clearly is not so disproportionate to the crime as to be arbitrary or shocking. *Doyle*, 347 F. Supp. 2d at 485. Further, Petitioner does not even argue that the facts found by the court at sentencing were either materially false or based on false information. *Tucker*, 404 U.S. at 447. Instead, Petitioner argues that the court should have reached a different conclusion based on the evidence before it. Such claims clearly fall far short of the sort of egregious circumstances implicating due process.

Finally, Petitioner argues that counsel was ineffective at sentencing for failing to argue leniency or other factors in favor of mitigation. Contrary to Petitioner's representations, defense counsel vigorously argued against the prosecutor's recommendation that pending offenses be used to score OV 13 at 25 points. (S. Tr., 8-9, docket #14.) The trial court carefully considered the arguments, but ultimately agreed with the prosecutor. (S. Tr., 12.) Moreover, counsel unquestionably asked the court to consider Petitioner's age and that fact that, under any sentence, he was not likely to be of an age at the time of his release to pose a threat to the community. Counsel also asked the court to consider the fact that Petitioner continued to maintain his innocence. (S. Tr., 15-16.) On the record evidence, Petitioner does not overcome the strong presumption that counsel's performance was reasonable.

V.      <u>Grounds 5 & 6: Right to New Trial</u>

In Ground Five of his habeas application, Petitioner argues that the Court should grant him a new trial under MICH. COMP. LAWS § 770.1, which authorizes the trial judge to grant a new trial "for any cause for which by law a new trial may be granted, or when it appears to the

court that justice has not been done." *Id.* In Ground Six, he argues that his conviction was against the great weight of the evidence and that he is entitled to a new trial under MICH. CT. R. 2.611(A)(1)(e).[6]

Petitioner fails to raise a federal issue cognizable on habeas review. Federal habeas review is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). "[F]ederal habeas corpus relief does not lie for errors of State law." *Estelle*, 502 U.S. at 67 (*quoting Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). The contention that a verdict is against the great weight of the evidence is a state-law argument directed to a defendant's right to a new trial. *See People v. Herbert*, 511 N.W.2d 654, 658 (Mich. 1993); *People v. Lemmon*, 576 N.W.2d 129, 133 n.8 (Mich.1998). Similarly, Petitioner's argument that he is entitled to a new trial because "justice has not been done," MICH. COMP. LAWS § 770.1, expressly rests on state law. *See Lemmon*, 576 N.W.2d at 133-34 (Mich.1998) (recognizing that a grant of new trial under either MICH. COMP. LAWS § 770.1, when "justice has not been done," parallels the grant of new trial under MICH. CT. R. 6.341(B), when the great weight of the evidence results in a "miscarriage of justice"). Consequently, a state prisoner's claim that he is entitled to a new trial because the jury verdict was against the great weight of the evidence or because justice has not been done are state law claims not cognizable on federal habeas review. *See Young v. Kemp*, 760 F.2d 1097, 1105 (11th Cir. 1985) ("[a] federal habeas court has no power to grant habeas corpus relief because it finds that the state conviction is against the 'weight' of the evidence"); *Cukaj v. Warren*, 305 F. Supp.2d 789, 796 (E.D.

---

[6]Although Petitioner cites MICH. CT. R. 2.611(A)(1)(e), that provision applies to civil, not criminal, proceedings. The comparable rule for criminal proceedings is found at MICH. CT. R. 6.431(B).

Mich. 2004) (federal courts have "no power to grant habeas relief on a claim that a state conviction is against the great weight of the evidence").

The appropriate inquiry for purposes of federal habeas corpus is not whether the verdict was against the great weight of the evidence or whether the verdict has resulted in a miscarriage of justice, but whether sufficient evidence was presented to support the conviction. Petitioner, however, has never challenged the sufficiency of the evidence. Nor could a sufficiency claim be sustained. A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988). Here, both Quianna Carter and Leeandrew DeVette gave eyewitness testimony that Petitioner was the person who robbed them. In addition, the in-store video, while not of perfect clarity, showed a man holding a knife who looked like Petitioner. Such evidence is more than sufficient to support the jury's finding that Petitioner committed armed robbery.

Accordingly, Petitioner's sixth ground for habeas relief is non-cognizable and without merit.

VI.     Ground 7:  Identification

Petitioner argues that Quianna Carter's identification of him at trial should have been suppressed because her identification of him at the preliminary examination was highly suggestive. He also argues that the trial court erred in refusing to take judicial notice of the unreliability of eyewitness identification and refusing to instruct the jury based on those noticed facts.

**a.     Suggestiveness of preliminary examination identification**

When reviewing a petitioner's claim that a suggestive identification violated his or her due process rights, a court's primary concern is with the reliability of the evidence. *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). The reviewing court engages in a two-part inquiry. *Wilson v. Mitchell*, 250 F.3d 388, 397-99 (6th Cir. 2001). "First, the court evaluates the undue suggestiveness of the pre-identification encounters." *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir.1986). Second, if the identification procedures are found to be unduly suggestive, the court turns to the central question; that is, whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive. *Wilson*, 250 F.3d at 397. Factors to be considered in evaluating the likelihood of misidentification "include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972); *see also Wilson*, 250 F.3d at 297 (quoting *Biggers*, 409 U.S. at 199-200).

In analyzing the suggestiveness of an identification, the court considers whether the procedure itself steered the witness to one suspect or another, independent of the witness's honest recollection. *See Wilson*, 250 F.3d at 297 (assuming without deciding that presentation to a witness of only two photographs, only one of which was a man with the same hairstyle, was unduly suggestive); *United States v. Russell*, 532 F.2d 1063, 1068 (6th Cir. 1976) (holding that an identification procedure was unduly suggestive because a witness identified the suspect by the process of elimination, with the police giving her another chance to make the identification after her first selection was not the person the police believed to be the guilty party). In the present case, Petitioner makes no argument about how either the preliminary examination or the preceding lineup was suggestive, and none is apparent on the record. Carter identified Petitioner without hesitation. (Prelim. Exam. Tr., 7.) Further, on cross-examination, Carter testified that she had unequivocally identified Petitioner at the lineup on September 6, 2002, from a group of five people. She denied having spoken to any other witness while waiting to view the lineup. (Prelim. Exam. Tr., 8-11.) She also denied having been shown pictures before her identification. (Prelim. Exam. Tr., 7-8.) In addition, a defense attorney was present and viewed the lineup for suggestiveness prior to any witness being allowed to make an identification. (Tr. II, 229-30.) Petitioner has failed to demonstrate that anything about the procedure at either the lineup or the preliminary examination was unduly suggestive. In the absence of undue suggestiveness, the court need not reach the issue of reliability.

However, even were the Court to reach the latter question, nothing about the two pretrial identifications casts doubt the reliability of the witness's testimony. *See Biggers*, 409 U.S. at 199-200. The first reliability factor is the length of time the witness had to observe the suspect

during the pendency of the crime. *See Russell*, 532 F.2d at 1066 ("There is a great potential for misidentification when a witness identifies a stranger based solely upon a single brief observation, and this risk is increased when the observation was made at a time of stress or excitement."). In the present case, Carter had far more than a passing glance at Petitioner. She had approximately one and one-half minutes of face-to-face interaction in which to observe Petitioner. While Carter indicated that the circumstances of the robbery were stressful, the opportunity for observation weighs in favor of the reliability of Carter's identification. Further, she testified that she was attentive to what Petitioner looked like, despite being scared. (Tr. I, 145.) Moreover, the description of the robber that Carter gave to the police was consistent with her eventual identification. (Prelim. Exam. Tr., 11; Tr. I, 146.) In addition, the next reliability consideration – Carter's level of certainty at the time of her identification – clearly weighs in favor of reliability. Carter immediately and confidently identified Petitioner at the lineup, at the preliminary examination, and at trial. Despite extensive cross-examination, she remained certain of her identification. Finally, only four days had elapsed between the robbery and the lineup identification. In sum, the *Biggers* considerations all weigh strongly in favor of the reliability of Carter's identification.

Petitioner also suggests that counsel was ineffective for failing to suppress the identification. Because no basis existed for suppressing the identification, counsel acted reasonably in not moving to suppress. *See Chegwidden*, 92 Fed. Appx. at 311.

### b.  Unreliability of eyewitness identifications

Petitioner argues that the trial court erred in failing to take judicial notice of the unreliability of eyewitness identifications. He also argues that the court erred in refusing to give special jury instructions about that unreliability. In support of his argument, Petitioner relies, as he

did in the state courts, on certain Michigan cases. *See Anderson*, 205 N.W.2d 461, and *Carson I*, 553 N.W.2d at 5. The Michigan Court of Appeals rejected Petitioner's claim, concluding that *Cooper*, 601 N.W.2d at 409, squarely held that "*Anderson* does not require any special jury instruction regarding the manner in which a jury should treat eyewitness identification testimony." (7/15/04 MCOA Op. at 2, docket #18.)

Petitioner's claim that judicially noticed evidence should have been presented to the jury is based solely on state law. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). No federal constitutional authority requires that a state court take judicial notice of any matter, much less a matter as ambiguous as the reliability of eyewitness testimony. Petitioner's claim therefore fails to demonstrate fundamental injustice.

Similarly, with respect to Petitioner's claim that the jury should have been instructed with the language of the *Anderson* case, his claim also fails to implicate due process. Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review. Instead, Petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). *See also Estelle*, 502 U.S. at 75 (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000) (same). If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law. *Id.*

Here, Petitioner claims that the trial court was required to give a jury instruction based on facts that were not introduced at trial. The Court is aware of no Supreme Court authority that requires a court to give an instruction that was not supported by trial evidence. *See Newton v. Million*, 349 F.3d 873, 879 (6th Cir. 2003). Moreover, the jury was instructed on the general considerations to be used in judging witness credibility. (*See* Tr. II, 290, 91.) Petitioner therefore cannot show that the absence of the instruction rendered the trial fundamentally unfair. Accordingly, I recommend that Petitioner's seventh habeas ground be denied.

VII.     Ground 8:  Prosecutorial Misconduct

In his eighth ground for relief, Petitioner asserts that he was denied due process by the prosecutor's failure to disclose a photograph displayed to Quianna Carter at trial. Petitioner argues that the prosecutor acted in bad faith by suppressing evidence and violating the discovery order, thereby preventing the defense from moving to suppress the identification.

Under *Brady v. Maryland*, 373 U.S. 83 (1963), "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Supreme Court has held that "[t]here are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Prejudice (and materiality) is established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 281 (quoting *United States v. Bagley,* 473 U.S. 667, 682 (1985)); *see also Cone*, 129 S. Ct. at

1783.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."
*Bagley*, 473 U.S. at 682.

The basis for Petitioner's claim is unclear.  Presumably, he refers to the prosecutor's use on redirect examination of a picture of the lineup array and an individual picture of Petitioner.  (*See* Tr. I, 158-59.)  During cross-examination, defense counsel showed Carter pictures of all of the participants in the lineup, with the exception of Petitioner.  He used those pictures to suggest that all of the other participants looked substantially different from Petitioner, thereby implying that the lineup was suggestive and that Carter's identification was not credible.  On redirect, the prosecutor showed Carter the full lineup array and the only individual picture not used by defense counsel, that of Petitioner.  (*Id.*)  Upon being shown the photographs, Carter confirmed that one was a picture of the lineup and the other was a picture of Petitioner.

Petitioner appears to argue that, because photographs existed of the lineup, they indicate that a photo array was shown to the witnesses, a fact that was not revealed before trial.  Petitioner's assumption is unreasonable.  First, Carter squarely denied ever having viewed pictures prior to her identification at the lineup, at the preliminary examination and at the trial.  (Prelim. Exam. Tr., 7; Tr. I, 146, 158.)  Second, nothing in the record suggests that a photographic array was ever shown to witnesses.  Third, prior to trial, defense counsel admitted that he had had an opportunity to view all the lineup photographs and the photograph of the lineup itself.  (Tr. I, 8.)  As a result, Petitioner's claim is devoid of evidence that the prosecutor withheld any material, much less that any material that was favorable to the accused.  Petitioner therefore fails to demonstrate a due process violation.

## VIII.    Ground 4:  Ineffective Assistance of Appellate Counsel

In his fourth habeas ground, Petitioner argues that his appellate attorney rendered ineffective assistance by failing to raise the issues presented in Petitioner's motion for relief from judgment, thereby depriving Petitioner with an opportunity for success on appeal.  Petitioner's claim does not state an independent ground for relief.   Instead, it provides cause that would excuse Petitioner's procedural default of his belatedly raised issues.   Inasmuch as I have declined to find Petitioner's claims procedurally defaulted and have addressed each independent ground for relief on the merits, the existence of cause to excuse the default is irrelevant, and Petitioner's claim that counsel was ineffective in failing to raise those issues on appeal can provide no basis for relief.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Dated:  April 26, 2010                                    /s/ Hugh W. Brenneman, Jr.
                                                          HUGH W. BRENNEMAN, JR.
                                                          United States Magistrate Judge


### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).